United States v. Hudak. You can correct me if that's wrong. Mr. Lester. Please the court, your honor. My name is Gene Lester and I represent Marian Hudak. The issue in this case is whether the jury should have been allowed to consider evidence of Mr. Hudak's mental health diagnosis and symptoms to disprove the specific intent element of the offense, here racial animus. Mr. Hudak was charged with two so-called hate crimes and one of the elements of the hate crime is that he committed the acts with racial animus. That was the specific intent element that we contested in this case and we wish to show evidence of Mr. Hudak's mental status in order to show that his behavior could have been or the was not because of racial animus. The evidence that was the rule we think that is controlling in this case is from Worrell and in Worrell this court has held that psychiatric evidence of a defendant's mental condition is allowed when such evidence is offered to rebut the government's evidence of specific intent. Here the government's the evidence that was not allowed was was of his mental health diagnosis and symptoms and that evidence could have been offered or could have been testified by Mr. Hudak himself at trial and that was denied as well as through the expert testimony of Dr. Graney. Her testimony could have been allowed and it was denied and what the evidence would have showed was that during the period of the offense conduct Mr. Hudak suffered from chronic mental health illnesses and those illnesses included obsessive-compulsive disorder, a aggravated form of generalized anxiety disorder, and paranoid delusions and those mental illnesses resulted in symptoms. Symptoms that he felt fear. Fear about being followed, fear about being lied on. Does it matter here that the defendant did not offer an insanity defense? No, your honor. He did not offer an insanity defense. Wouldn't that have made the Graney's expert report more relevant? Your honor, we believe that Mr. Hudak was competent to test, competent to stand trial and he was not insane and that he had ability to control himself but that an explanation for this conduct was that he suffered from these conditions. In fact, the district court looked at the report and said it's not relevant because it covered a state of mind. It was one year after the J.S. offense and two years after the J.D. and that there isn't anything in the report that addressed the question of what his mental state was during the time of the actual conduct. Well, you know, somebody's mental state I suppose can change rather dramatically within a year or two years. We disagree with the district court's interpretation of Dr. Graney's proposed testimony. Why didn't Mr. Graney's report address the mental health, the situation of mental health at the time of the offense rather than several years later? Right, so Dr. Graney was an expert who was retained by previous counsel to determine whether he was competent to testify and Dr. Graney's report concluded that he was competent to testify and that report was published about October 31st. And I was appointed in the case in November and having read the report and looked at the contents of the report, not necessarily her conclusions. It was an odd sort of report, wasn't it? Man-made death threats and everything and the report called them insults. Well, I mean, you know, insults are no big deal. I mean, sticks and stones break my bones but words will never hurt me. That's insult. But then, you know, you ratchet it up to what the defendant was doing. He was issuing death threats and that's not just an insult. That goes so far beyond being an insult and that's what the report kept calling them. Well, there's no doubt that we conceded at trial that Mr. Hudak had the specific intent to make threats, that he had the specific intent to perform and do the conduct, the bad conduct. But the difference here is that there are, that this offense required it to be proven by the government specifically that he did it for purposes of racial animus. And what we wish to do was present not only Dr. Graney's expert testimony, which was denied, but also his testimony that he suffered from these mental conditions that caused him to have fear about being followed or spied upon, being stalked, repeatedly engaged in behaviors like looking out his windows, and to have a difficulty regulating his emotion and difficulty with ambiguous situations that he tended to see things more threatening than they might be, that he had angry outbursts. I mean, just in terms of the intent here and the question of because of in the statute, wasn't there a lot of evidence that this individual, Mr. Hudak, became enraged by the simple fact that it was a black man who he thought was blocking his way? And it was that fact that just completely set him off. And isn't that about as clear an example as of a racist crime and a racist act as one could expect? I mean, if that doesn't qualify as a racist motivation, then I don't know exactly what would. Well, I think the government had ample opportunity to demonstrate that there was racial animus here. And what we were asking to do was to allow expert testimony or non-expert testimony in the form of mental health to demonstrate that there was another explanation for the purpose, the goal here. But he flipped out over the race of the individual whom he thought was blocking his way. If that had been a white person who was blocking his way, he would have been able to maybe think no big deal. But he flipped out over the race of the individual. And that's what this that's the kind of behavior that the statute is aimed at. That's correct. And the question here is, why did he flip out? Why did he flip out when he was confronted on the highway with a loud vehicle? Why did he flip out and become enraged when a neighbor revved his car to a high degree? Now, one of the reasons for that is because he harbored racial animus against these individuals and didn't like the way they presented themselves because of their race or national origin. And that would have been enough to convict him. But another possible inference and the one that we were denied, allowed to present, is that he suffers from serious mental health conditions that are consistent with these behaviors. And therefore, he has delusions in his head. He has fears. He has, he catastrophes. He believes that things are more serious than they are. He misjudges. Something Judge Wilkerson alluded to earlier, these offenses occurred between November 2021 and October 2022. Right. The report details incidents that are far earlier than that. And even goes so far as to say, well, he's doing fairly well by November of 2016. He has a small setback. He's drinking somewhere around 22, I guess. But that's related most to this fear of washing his hands excessively, OCD. And so it doesn't, it doesn't seem to match up as to an expert's testimony that's going directly to his mental state, even if it is admissible, during the period of time he committed offenses. Your Honor, the purpose of the report was to determine whether he was capable or he was competent at the time of trial. And so her conclusions are that he is competent at the time of trial and some of these conditions are in remission. But what she says in the report and what she says at sentencing, which the court can consider as a proffer of her testimony here, is that these are chronic conditions that may be in remission. And specifically, there are three conditions that she says were active. One was the OCD, the other was the anxiety disorder, and the other one, the delusions. And she said those are in remission because he's been in jail, essentially. And some of the stimuli and some of the alcohol and some of the other problems are less prevalent because at the time of the report, he had been in prison. But he had suffered from all of these conditions since either 2006, 011, or more recently. And what she would testify to was that the behavior was present during the offense conduct in 2021 and October of 2022. How does the mental report, in your view, at least the mental health impact, indicate that he acted in part for something other than his race? Right. So I think that's a question for the jury to determine. And here, what we wanted to do was to present evidence that when someone is delusional and has outstretched fears for what would be normal, they may act out. None of which you have an expert testimony indication that occurred during the period of time that these offenses occurred. Everything you just said, delusional and all of that, there's nothing in that report that says he suffered from that other than an inference or maybe a speculation that he was, this was going on the whole time. Right. So what she would testify to is that he suffered from these chronic conditions and these chronic conditions were consistent with his offense conduct and that these chronic conditions existed during the offense conduct. And therefore, somebody who has these conditions would act out in this way. It's not in the report, though. Well, I think it is in the report. What's not in the report are the conclusions. What's in the report are conclusions that have to do with his competency at the time of trial. And also, Your Honor, we also asked to present this evidence through Mr. Hudak and we were not allowed. And so it wasn't just the report. We think that the judge made an error of law in disqualifying this evidence completely. And I understand the basis for introducing this evidence to be Rule 404B. That seems to be an odd fit. Yeah. So I think that, and the more I think about this, Your Honor, I think perhaps the first threshold issue is whether the court committed an error of law in categorically saying the mental health testimony in this instance to negate a specific intent crime was not admissible. And I think that's an error of law. Under what rule? Under the Worrell case. And then I think that the court erred in not applying Rules 401, Rules 403 and finding that it's probative, that it's relevant. And then I think the court erred in its judgment that it would not have assisted the trier of fact under Rule 704 or 703 to assist it in determining whether or not he had the specific intent of racial animus. Was this evidence introduced to show that it was a contributing factor to the attacks? That his mental health was a contributing factor to it? It would have been introduced to negate the specific intent element of racial animus. But was it introduced to show that at least it was a contributing factor to the attacks? Yes. It could show that somebody with these conditions is motivated by things going on with obsessiveness, things going on in their heads, fear of people looking at them or watching them. Because if you look at the offense conduct, he gets involved in altercations with people over fairly minor incidences. He says, oh, with respect to the incident on the highway, he says, oh, there's too much noise on the road. I'm going to get out of my car and confront this person. Oh, there's too much lights coming into my windows. I'm going to get out of my house and confront this person. But isn't that the kind of diminished capacity defense that Worrell prohibits? I don't think so, Your Honor. I think that Worrell does not allow, Your Honor, I see my time is up. No, you can answer. That it doesn't allow you to say that he lacked the control to do those things. It's just why did he do those things? So the purpose of what we're asking is why? And this is only a crime if he did it because the person was black and Hispanic. It's not a crime if he did it because he has serious mental health issues for which he's manifesting. So, you know, the country is being, our country is being badly frayed by these extremist acts of violence. And a lot of the extremist acts, they're But it does seem to me that that racism is an element in many of the extreme acts that are perpetrated. And Congress responded with these statutes, which was designed to track racial motivations. And in all of these cases, there's some mental health defense that's interposed. But that's, you know, that's just way too broad a business to, you know, direct a verdict or take something out of the jury's hands. Because obviously, there's a mental health disturbance that's led to this kind of vile behavior. People who are balanced in their outlook and perspective on life do not go about acting in this sort of way. And so there's always going to be, oh, it was my mental health, I was mentally unhealthy. Well, all of these people that commit these horrible, horrible acts are mentally compromised, they're mentally unhealthy. But that doesn't, that doesn't mean and, you know, in some way, that these things are, are excused, or that that they should not be held culpable, to a significant extent. That's what we have. That's what we have before us here. He said, Oh, I was mentally com- I didn't, I wasn't in good mental health. Well, you know, so what? It's a great question. And, and if we buy on to this whole idea of mental health, as an excuse, we're simply apologizing for acts that are tearing the country apart. And, you know, as far as your defense of this Nazi propaganda was just being, because he was purely a collector. This was with respect to the JD offense. Well, he can collect this filth as he wants. And he can display this filth out of his window, I suppose, and everything, but it's still relevant to why he was acting in the way that he was with JD, which I guess he thought was consistent with some kind of Nazi propaganda about some kind of horrific and holy evil idea of racial superiority. And this is what this person seems to have been driven by from the get go. And it shouldn't be, there's no way that the jury should be required to countenance what happened here. What happened here is all too emblematic. It's happening too many places to too many people. You see, racial animus, religious animus, ethnic animus. And I know that no way is that a path forward for this country. And I'm not sympathetic with this in one little bit. He had a right to a jury trial. And I understand that. He was given a jury trial by a very capable district judge who made one 403 ruling seemed perfectly defensible to me and then another 404B ruling. This went to this individual's intent, seemed perfectly defensible to me. I'm all for giving him a jury trial, but jury came down hard on this. They expressed the community spirit that this is not who we are. And, you know, it's not my office to overturn what I think were the jury's good instincts. I'd let it stand. Judge Diaz, may I briefly respond? Good luck. The, I agree with with much your sentiment, Judge Wilkinson, and I only very narrowly suggest that the law is broad enough to allow that mental health evidence be used to justify, is not used to justify or excuse the criminal conduct. But it can merely be an aid to a jury in determining the defendant's state of mind with respect to the specific actions they took or committed. And so the question for the jury was whether racial animus was the motivating factor. And some evidence of that or some potentially helpful evidence to the defendant was his mental state, and that wasn't allowed. But I have no problem with the jury deciding the case on the issue of racial animus, given the narrow purpose of allowing that mental health evidence. All right. Thank you, Mr. Lester. Mr. Levine. Good morning, your honors. May it please the court, Brant Levine for the United States. The district court here committed no abuse of discretion in its evidentiary rulings. And I'd like to begin with the mental health evidence, specifically Dr. Granley's report. The district court issued a thorough and well-reasoned opinion, holding that Dr. Granley's expert testimony is barred under Rule 702 because it would be irrelevant and unreliable. In HUDAC's opening appellate brief, HUDAC does not allege any error, much less an abuse of discretion in that decision. There is no challenge whatsoever to that ruling. Instead, HUDAC claims that the district court should have looked at this under Rule 404B. But Rule 404B is not some magic talisman that can transform inadmissible evidence into admissible evidence. Once evidence is inadmissible under a federal rule or statute, that ends the matter. Rule 404B has no role to play, and HUDAC abandoned any other challenge to the expert testimony. Now in HUDAC's reply brief, HUDAC raises a new argument for the first time, and putting aside that that's improper, I'd like to address that, and that is under the Insanity Defense Reform Act, that the evidence would be admitted to negate specific intent. One thing that we do agree with HUDAC on is that this court's decision in the United States versus Worrell controls. But we have a very different reading of that decision. What that decision says is that a defendant is prohibited from arguing that a psychiatric condition compelled him to act. That a psychiatric condition prevented the defendant from engaging in normal reflection before acting. That is exactly Mr. HUDAC's defense here. And again, on page 7 of HUDAC's opening brief, he says that he wanted to introduce this evidence to show that his conduct arose from his mental health struggles. And that is precisely the type of evidence that is prohibited under the Insanity Defense Reform Act, as this court emphasized in Worrell. Now in Worrell, this court did recognize that there might be a rare case where you can use mental health evidence to negate specific intent. But when this court was talking about specific intent, it's talking about mens rea. And here, HUDAC conceded at trial that he had the mens rea to commit this offense. On Joint Appendix page 109, Mr. Lester said to the court on the hearing on this issue, quote, we're actually agreeing that he has the willful mens rea to do these things, end quote. That ends the matter. Anything else is going to lie. And one thing, too, Mr. Lester said, and it's in the briefs, that the government was required to prove racial animus. That is not correct. Racial animus is not an element of this crime. What the element of the crime under the plain text of the statute is that we have to prove that the defendant acted because of the race or color of the victim. And I'd like to just briefly quote from the jury instructions here, the uncontested jury instructions, because I think that really highlights the issue here to show that there was no error. The jury instructions say, quote, a person may have multiple reasons for his actions, and you need not find that the defendant acted as he did solely or even primarily because of J.S.'s race or color. In fact, you may find that J.S.'s race or color had only a slight or incremental effect on the defendant's actions toward J.S. as long as you find that the defendant would not have acted as he did in the absence of J.S.'s race or color, end quote. So right there, Your Honor, that encapsulates the well-reasoned axiom that defendants often have multiple reasons for committing crimes. Here, both things can be true. Maybe Hudak would not have committed this offense but for his mental health, but it can also be true that he would not have committed this defense but for the race or color of the victims here. And how is that statement different from racial animus? What's the difference, the daylight that you see between those? The daylight between those, the essence of Hudak's defense, if I understand it right, he's not necessarily disputing that he targeted people because they had black or brown skin. What he seems to be saying is, look, I don't hate black or brown people. I did this because I have these mental health conditions. So there's a very little bit of daylight there, but we don't have to prove racial animus. That would make it extraordinarily difficult in hate crimes cases for the government to prove this because oftentimes defendants will say, look, I don't hate black people. I don't hate gay people. And we don't have to prove that there was actual hate. We just have to prove that the defendant would not have committed the crime had the victim been, say, white instead of black. And here there's overwhelming evidence in the record, as I think the judges have noted, that the defendant would not have committed these crimes against white people. There's evidence that he used the n-word multiple times against the black victim. His Mexican neighbors used vulgar terms to reference that they should go back to their country. So there is a lot of evidence in this case if this court wanted to even rule on harmless error that would be another basis because there is such overwhelming evidence of guilt. If the court doesn't have any other questions on the mental health issues, I'll briefly address the Nazi paraphernalia. I'm turning to the Nazi paraphernalia. As Judge Wilkinson noted, it is highly relevant in this case, but I think there's an even easier way for this court to resolve that issue, and that is Hudak opened the door. The first time the jury heard anything about Nazi paraphernalia was from Hudak himself. When his counsel was asking him where he got a racist pamphlet that used the n-word and depicted violence against black people, Hudak said, I got this from somebody at a gas station and he gave me KKK flags and Nazi flags. Right there. He kept saying he was a collector. Well, as I pointed out, if he wants to collect this filth, it's up to him. He can collect it, but the evidentiary question is whether it's relevant to the reason that he committed the offense, and it seems to me if your home environment is saturated with Nazi paraphernalia, that bears rather acutely on the foundation for the offense. So the district court let it in. Nothing, you know, nothing wrong with that. We agree with that, Your Honor. People who display Nazi flags do not limit their hate to Jewish people. The Nazi flag and the swastikas are universal symbols of hate, and as far as whether he was a collector or not, that goes to the weight of the evidence, and the jury couldn't decide that. That maybe this isn't a symbol of hate, maybe that he was just a collector. That's for the jury to decide, and the jury did decide that here. If there are no further questions, we would ask this court to affirm the convictions. Thank you. Thank you very much. Your Honor, I would concede that the judge unlikely committed any error with respect to not allowing the Nazi memorabilia or the Nazi relics or other evidence of racial intent. What he didn't do was allow the defendant to put on some evidence to negate the specific intent. While the government was allowed to present these things that exist in the world and then link them to his mental state, he was unable to present credible evidence of that his medical condition likely was a motivation for some of the conduct that he exhibited, and it was up to the jury to decide, and you talk about... Well, but before you get to that, you have to admit, and Judge Winn, I think, may have asked you about this. I'll ask you to reemphasize the point. So we've got Worrell, which generally bars this kind of evidence, and what's the exception that you're relying on? The exception is stated in Worrell, and it says as long as it goes to negate the specific intent, and it's not showing a lack of volitional control, and what Judge Graney says is that he had full capacity to not only understand and be tried, but he also had full capacity to either commit these acts or not. But what she was saying, and what we would have presented to the court, to the jury, was that when someone is hearing things and someone is thinking a certain way and someone has anger issues, they're likely to act out. And then we would tell the jury, regardless of what the race of the person was, that these are triggers that happen. Now, racial animus can be shown through racial slurs, but that also cuts two ways. It can be intimidating, which we don't disagree that he had the intent to be intimidating, but it can also go to show that he had racial animus. So it cuts both ways. But we were unable to show, at least with respect to this evidence that Worrell should allow categorically in a limited basis. And we think that the judge could have offered a limiting instruction in saying, look, this, to Judge Wilkinson's point, this evidence does not excuse the conduct. It is not an affirmative defense of the conduct, but it may allow an explanation as to why he committed the conduct, separate and apart from racial animus, and that element alone. As far as the evidence that he let in, I would think that would go to, I thought it was a question of weight, not admissibility. You know, it seemed a question of weight. And I wanted to, my lack of sympathy for the situation does not affect my feeling that he should have a jury trial, and that he should have the best legal representation available. I'm sure the chief will express the court's appreciation, but it's a tough case for you and everything. I really appreciate your taking it on. It's an unattractive, a very unattractive situation. And it's why I respect you for taking it on. Thank you, Judge. We respectfully request that the court allow the evidence that was proffered, either through Dr. Graney or through Mr. Hudak, with respect to his mental health, to negate the specific intent element to remand the case for retrial. All right. Thank you, Mr. Lister. Judge Wilkinson said better than I that we are, we are indeed grateful and recognize that your court appointed, I think you were the trial counsel as well, so doubly grateful for your willingness to do this, particularly in these trying times when court appointed lawyers are essentially working without pay, given the budget difficulties we're facing. So thank you for that. And Mr. Levine, thank you for your excellent representation of the United States in this matter. We'll come down and greet both of you and then adjourn this session of court.
judges: Albert Diaz, J. Harvie Wilkinson III, James Andrew Wynn